**TEXAS MONTHLY, INC.; Mediatex Communications Corporation; and Gary Cartwright, Appellants,**

v.

**TRANSAMERICAN NATURAL GAS CORPORATION and John R. Stanley, Appellees.**

No. 01–97–00812–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 30, 1999.

Julie A. Ford, Austin, Danielle Clarke, Houston, for appellant.

William Christopher Carmody, Dallas, Roger Townsend, Houston, for appellee.

Panel consists of Justices MIRABAL, WILSON and TAFT.

## OPINION ON MOTION
## FOR REHEARING

DAVIE L. WILSON, Justice.

Plaintiffs filed a motion for rehearing. We grant the motion, withdraw our opinion and judgment of July 23, 1998, and issue and render a new opinion and judgment.

This appeal arises from a libel suit brought in the trial court by Transamerican Natural Gas Corporation (TNG) and John Stanley (a/k/a Jack Stanley), collectively plaintiffs, against Texas Monthly, Inc., Mediatex Communications Corporation, and Gary Cartwright, collectively defendants. The trial court denied in part a motion for summary judgment filed by defendants. Defendants then brought this accelerated, interlocutory appeal. Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(6) (Vernon Supp.1999).[1] We reverse and render.

## Facts

*Texas Monthly* published an article entitled "The King of Bankruptcy," by Gary Cartwright, in its July 1995 issue. "The King of Bankruptcy" concerns Jack Stanley and his company, TNG. The article asks in its heading, *"How did Houston natural gas mogul Jack Stanley go from $1.2 billion in debt in 1983 to $2 billion to the good eleven years later? A recent trial gave some clues."* The text contains allegations and testimony from a lawsuit tried to a Houston jury the previous fall. The lawsuit (BDS lawsuit or litigation) described in the article is the focal point of Stanley's libel claims against *Texas Monthly.*

The BDS lawsuit was filed by TNG against three of its former employees, Richard Bloodgood (controller), Alton Davis (revenue accounting supervisor), and Vic Stone (chief financial officer). TNG alleged that these men breached their confidentiality agreements and formed a partnership (called "BDS") to advise people suing TNG. TNG claimed that the three men took secret TNG documents to use in a lawsuit brought by natural gas royalty owners against TNG.

The BDS defendants brought counterclaims alleging that the documents showed

TNG defrauded royalty owners and the State of Texas, and that TNG committed bankruptcy fraud. The BDS defendants said they were justified in working against their former employer because Stanley had defrauded many people. The BDS defendants claimed that Stanley manipulated the company's operations to avoid paying creditors and royalty owners; that he defrauded those creditors and royalty owners; that he forced them to sue for money due to them; and that, in those lawsuits, TNG hid information, destroyed documents, and asked employees to give false testimony. Jack Stanley's own son, Billy, testified against him, claiming that in addition to defrauding creditors, his father routinely wiretapped the offices of his litigation opponents and had bribed public officials.

At the close of testimony, the jury awarded the BDS defendants $8 million on their counterclaim. Cartwright was told, however, that TNG later won a motion for mistrial.

The *Houston Chronicle*'s November 1994 article about Jack Stanley was noticed by the editorial staff at *Texas Monthly,* and writer Gary Cartwright decided to write an in-depth story about Jack Stanley. Cartwright read newspaper and magazine articles about Jack Stanley and TNG. He spoke to BDS' lawyers and to Stone, Davis, and Billy Stanley. Cartwright tried to interview Jack Stanley, but Stanley refused to speak to him. In writing the article, Cartwright relied on court transcripts and interviews with witnesses and attorneys.

Plaintiffs alleged in their petition that the Cartwright article contained libelous statements. Defendants filed a motion for summary judgment which was partially denied,[2] leaving seven alleged libelous statements for review by this Court.

---

1. Section 51.014(6) specifically allows an appeal of an interlocutory order that "denies a motion for summary judgment that is based in whole or in part upon a claim against or defense by a member of the electronic or print media." Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(6) (Vernon Supp.1999).

2. The trial court rendered summary judgment in favor of the *Texas Monthly* defendants with

## Standard of Review of Summary Judgment

The same standard of review that governs the granting of a motion for summary judgment applies to the denial of a summary judgment. *Ervin v. James*, 874 S.W.2d 713, 715 (Tex.App.—Houston [14th Dist.] 1994, writ denied). The movant for summary judgment must show there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995); *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex.1985). In deciding whether there is a disputed material fact issue precluding summary judgment, we take evidence favorable to the nonmovant as true. *Randall's*, 891 S.W.2d at 644; *Nixon*, 690 S.W.2d at 548–49. We also indulge every reasonable inference in favor of the nonmovant and resolve any doubts in its favor. *Randall's*, 891 S.W.2d at 644; *Nixon*, 690 S.W.2d at 549. If the movant's motion for summary judgment proof facially establishes its right to judgment as a matter of law, then the burden shifts to the nonmovant to raise fact issues precluding summary judgment. *Ervin*, 874 S.W.2d at 715. A defendant who conclusively negates at least one of the essential elements of a cause of action is entitled to summary judgment on that cause of action. *Randall's*, 891 S.W.2d at 644. Likewise, a defendant who conclusively establishes each element of an affirmative defense is entitled to summary judgment. *Id.* at 644.

In their first seventeen points of error, defendants contend the trial court erred in denying the motion for summary judgment based upon either (1) the fair, true, and impartial privilege or (2) the reasonable-and-fair-comment privilege contained in Civil Practice and Remedies Code section 73.002. TEX. CIV. PRAC. & REM.CODE ANN. § 73.002(b)(1)(A), (2) (Vernon 1997).

regard to four of the allegedly libelous state-

## Fair, True, and Impartial Privilege

Texas grants a qualified privilege to media defendants which republish defamatory statements first raised in judicial proceedings, provided the statements are "fair, true, and impartial." Civil Practice and Remedies Code section 73.002(a), (b)(1)(A) provides:

(a) The publication by a newspaper or other periodical of a matter covered by this section is privileged and is not a ground for a libel action. This privilege does not extend to the republication of a matter if it is proved that the matter was republished with actual malice after it had ceased to be of public concern.

(b) This section applies to:

(1) a fair, true, and impartial account of:

(A) a judicial proceeding....

TEX. CIV. PRAC. & REM.CODE ANN. § 73.002(a), (b)(1)(A) (Vernon 1997).

 To determine whether a media defendant's account of a judicial proceeding is "fair and impartial," it must be interpreted in the sense that the ordinary reader would understand; the statutory requirement that the published account be true is satisfied if it is substantially correct. *Crites v. Mullins*, 697 S.W.2d 715, 717 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.). The substantial truth test involves consideration of whether the alleged defamatory statement was more damaging to the plaintiff's reputation in the mind of the average listener than a truthful statement would have been. *See id.* If the effect on the mind of the recipient would be the same, any variance between the actions charged and the actions proved should be disregarded. *Finklea v. Jacksonville Daily Progress*, 742 S.W.2d 512, 515 (Tex.App.—Tyler 1987, writ dism'd w.o.j.); *Crites*, 697 S.W.2d at 717. Although it may greatly exaggerate the libel-plaintiff's misconduct alleged in a judicial proceeding, an article is substantially true if an ordinary reader would not attach

ments in the article.

any more opprobrium to the plaintiff's conduct merely because of the exaggeration. *Langston v. Eagle Printing Co.,* 797 S.W.2d 66, 69–70 (Tex.App.—Waco 1990, no writ); *Crites,* 697 S.W.2d at 717; *see also Dudley v. Farmers Branch Daily Times,* 550 S.W.2d 99, 100 (Tex.Civ.App.—Eastland 1977, writ ref'd n.r.e.) (privilege attached despite appellant reportedly being charged with theft of $168,000 of polyethylene scrap rather than $6,655.50). The defendant asserting the statutory privilege is not required to prove the truth of the allegations that it repeats to its readers. Rather, it need only prove that the statements in the article are a "fair, true, and impartial" account of the trial record. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 73.002 (Vernon 1997).

The Texas Supreme Court's application of the substantial truth test to a report of a judicial proceeding demonstrates that considerable latitude has been given in this context. In *Hill v. Herald–Post Publishing Co.,* the El Paso Court of Appeals ruled that the following statement from the news article was not privileged:

> *"Witness says she was threatened over testimony"* that Barbara Tovar, a defense witness in the Contreras case "testified that a lawyer and his investigator implied threats if she testified in the trial of Jose Contreras. Tovar said after she gave Contreras's attorney, Rod Ponton, a signed affidavit, lawyer Gary Hill and investigator Ivan Enriquez told her if she testified in the trial other persons 'would say certain things concerning criminal accusations.' "

877 S.W.2d 774, 781–82 (Tex.App.—El Paso), *aff'd in part, rev'd in part,* 891 S.W.2d 638 (Tex.1994).

In actual testimony, Tovar did not say that lawyer Hill had implied threats. 877 S.W.2d at 781. She said that she had two meetings: one with Hill and his investigator, and a second with just the investigator. *Id.* During the first meeting, when Hill was present, Tovar testified that "they" just told her to tell the truth. *Id.* In the second meeting, however, the one

with the investigator only, she felt intimidated and decided that she did not want to testify. *Id.* Hill contended that since the article states Hill threatened Tovar or implied threats if she testified, whereas she actually testified that in her meeting with Hill, he told her to tell the truth, it was not a fair, true, and impartial account of the judicial proceeding and therefore not privileged under section 73.002. *Id.*

The El Paso Court of Appeals believed the article's unambiguous attribution of the implied threat to attorney Hill, when he was not even present at the meeting, was not substantially true and, therefore, not within the privilege. *Id.* at 782. However, the supreme court disagreed and reversed, stating:

> Based upon the circumstances in which the threat was communicated, Ms. Tovar's testimony that the person who made the threat worked as an investigator for Hill, that the threat was communicated in Hill's office, and that Hill had personally met with Ms. Tovar on a prior occasion in a coercive environment, we conclude that the Herald–Post's August 13, 1987 article was "a fair, true, and impartial account of ... [the] judicial proceeding ..." and is privileged under section 73.002 as a matter of law.

*Herald–Post Publ'g Co.,* 891 S.W.2d at 639; *see also Simmons v. Ware,* 920 S.W.2d 438, 448 (Tex.App.—Amarillo 1996, no writ) (statement that affidavit said plaintiff drank toast to DA's castration, when plaintiff denied participating in toast, held substantially true because plaintiff was attending party when toast made).

We must now determine whether the seven statements complained of in the article were substantially true. A showing of substantial truth in a motion for summary judgment will defeat a defamation claim. *McIlvain v. Jacobs,* 794 S.W.2d 14, 15 (Tex.1990). This evaluation involves looking at the "gist" of the broadcast. *Id.* at 16. If the underlying facts as to the gist of the libel charge are undisputed, then we can disregard any variance with

respect to items of secondary importance and determine substantial truth as a matter of law. *Id.* at 16.

### Statement 1

**Testifying last fall in a multiparty lawsuit in Houston's 190th District Court, *Billy Stanley and* two *other* former *high-ranking* [TNG] *employees alleged* that *the company* had systematically cheated royalty owners and drilling partners, hidden assets from the bankruptcy court, forged and destroyed documents, broken into the offices and homes of employees, *wiretapped the phones of employees and of parties in litigation,* and bribed public officials.**

This statement appears in the second paragraph of the article and is a description of allegations and testimony from the BDS trial.

■ Plaintiffs complain that defendants used the allegations of wiretapping, a term that is associated with illegal activity, as a literary device to grab the readers attention. *See* TEX. PENAL CODE ANN. § 16.02 (Vernon 1994 & Supp.1999) (unlawful interception of wire communications). Plaintiffs further contend that the "wiretapping was nothing more sinister than the lawful decision by [TNG] to monitor internal telephone conversations of its employees" and that the article failed to explain that the monitoring was lawful, inviting the inference of illegal activity.[3]

It is undisputed that there was testimony at the BDS trial about TNG's wiretapping activities. Wiretap is defined as "to tap a telephone or telegraph wire in order to get information." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1357 (10th. ed.1993). Billy Stanley testified TNG had an office set up so that his father could listen in on every conversation in the company, including board conversations. Moreover, the testimony was not just about what plaintiffs refer to as authorized monitoring—it described how TNG wiretapped the offices of third parties being sued by TNG. Billy Stanley even expressly characterized the wiretapping activities as illegal in his testimony.

Plaintiffs also contend that Billy Stanley was not a "high-ranking" employee of TNG and that the defendants' inclusion of this designation gave enhanced credibility to his allegations. Billy Stanley testified that he was in charge of TNG's Laredo office and that he was sent to Laredo to act as the "eyes and ears" of his father.

In determining whether *Texas Monthly*'s account was fair, true, and impartial in reference to the court record, we focus on the effect on the mind of the reader regarding any variance. If the effect on the reader's mind would be the same, any difference between the statements made in the record and the media account of the proceeding should be disregarded. *See Finklea,* 742 S.W.2d at 515. Here, there was substantial testimony regarding TNG's wiretapping activities. Stanley's own son characterized the wiretapping activities as illegal. Moreover, Billy testified that he was in charge of the TNG's Laredo office. In the mind of the ordinary reader, no greater opprobrium would attach to plaintiffs' conduct merely because of the use of the term "wiretapping." Moreover, any ill effect arising from Billy's rank is not as harmful to Stanley as the fact that Billy was his own son.

We conclude that the gist of the statement, *i.e.,* that Billy Stanley alleged the company had wiretapped employees, was a fair, true, and impartial account of Billy Stanley's testimony, Therefore, the trial court erred in denying the motion for summary judgment on the basis of the fair, true, and impartial privilege contained in section 73.002.

---

**3.** Plaintiffs acknowledged at oral argument that their only complaints were about the

italicized portions of the statement.

## Statement 2

**Both Bloodgood and Davis quit the company as a matter of conscience, but Stone was fired.**

■ Plaintiffs argue that this statement is defamatory because it implies TNG's conduct was so reprehensible that Bloodgood had to quit. Plaintiffs point to the affidavit of Bloodgood in which he testified that he resigned from TNG because "I did not feel I received proper management support. I did not resign from [TNG] because of a matter of conscience."

Bloodgood was sued by TNG, as were Stone and Davis. Like the other two, Bloodgood filed his own claims against TNG. Unlike Stone and Davis, however, Bloodgood settled with TNG before trial and did not testify before the jury. Before settling, however, Bloodgood had made his position clear in a second affidavit. Bloodgood's affidavit described why he quit his job, stating that he disagreed with the continued deception by TNG and "because I was extremely anxious and fearful about [TNG's] deception to the State of Texas and the royalty owners." The affidavit also contains detailed descriptions of TNG's fraudulent accounting practices. We also note that the pleadings filed by Bloodgood in the BDS case state "Bloodgood resigned under duress from [TNG's] employment on April 22, 1988 because he would not participate in fraudulent, illegal practices and continued abuse of the legal process."

We conclude that for purposes of substantial truth in reporting the judicial proceeding, it would make no difference in the mind of the ordinary reader whether Bloodgood quit the company "as a matter of conscience" or because he was "extremely anxious and fearful about [TNG's] deception to the State of Texas and royalty owners"; no ordinary reader would attach more opprobrium to the former fact, if true, than the latter. We, therefore, conclude the trial court erred in denying the motion for summary judgment on the basis of the fair, true, and impartial privilege

contained in section 73.002 with regard to statement 2.

## Statement 3

**The bankers believed—and Stone confirmed—that Stanley was deliberately attempting to undervalue his company as a ruse to avoid liquidation, that he had directed his accountants to cook the books.**

■ In determining defamatory context, we examine the article in its entirety rather than examine separate sentences or excerpts from it. *Schauer v. Memorial Care Sys.*, 856 S.W.2d 437, 446 (Tex. App.—Houston [1st Dist.] 1993, no writ).

■ The article states in part:

In his testimony to the jury in Houston, Stone said he had discovered that [TNG] was cheating and lying to creditors, systematically cheating royalty owners, concealing evidence from litigants, and falsifying documents.

At the time of his employment, Stone told the jury, the creditor's committee had "grave doubts" that the figures they had been seeing in the monthly reports from [TNG] were accurate.

The bankers believed—and Stone confirmed—that Stanley was deliberately attempting to undervalue his company as a ruse to avoid liquidation, that he had directed his accountants to cook the books. Stone showed the jury a letter written to him in 1986 by John Nabors, [TNG's] chief outside attorney, suggesting that in the disclosure statement that Stone was helping draft for the creditors, the overall liquidation value should be under $500 million. "In order to present something that was unattractive to the creditors in terms of liquidation ... the value had to be under $500 million," Stone explained.

Stone went down a long list of 'accounting irregularities' that he discovered after he took the job. The purpose of these irregularities, Stone told

the jury, was to create a cash flow that would permit Stanley to expand his business outside the jurisdiction of the bankruptcy court. About the same time that Stanley filed for bankruptcy in 1983, Stone said, [TNG] formed an affiliated company called Southwest Texas Services. The purpose of the company, or so it appeared to Stone, was to divert money from creditors. Moreover, Stone discovered, the company was selling goods and services to [TNG] at inflated prices. Stone said that when he told Nabors and [TNG] president Craig Shepard that Southwest Texas Services was gouging the company, they told him to mind his own business. Within a few years, other suspect vendors and oil-field supply companies began to do business with [TNG].... "What's irregular about it," Stone explained, "is that these companies were all controlled by or through Mr. Stanley ..." Millions of dollars were changing hands, and none of the money was going to the creditors.

Later in the article, Cartwright includes a specific denial by Stanley to this allegation:

Point by point, Stanley denied to the jury the accusations made against him. He said that it was 'absolutely untrue' that he ever told Stone that he couldn't make accounting changes without Stanley's personal approval. Nor did Stone ever advise him that there was something fraudulent going on with [TNG's] royalty accounting: "Absolutely not, he never did any such thing." On the contrary, Stanley assured the jury, he made a point to avoid personal dealings with [TNG's] accounting department. "I do not have any education in accounting," he said. He had never even heard the phrase 'cook the books' before.

Plaintiffs contend statement 3 is not substantially true because (1) Stone did not utter the phrase "cook the books" during his testimony, (2) Stone did not testify that Stanley had directed TNG's accountants to undervalue the company as a ruse to avoid liquidation, and (3) the attribution of this statement to Stone dramatically magnified the opprobrium associated with the statement. Plaintiffs argue that a fact issue exists as to whether the statement would create in the mind of an ordinary reader a substantially false impression that the former chief financial officer of TNG accused Stanley of defrauding his creditors.

Stone, the chief financial officer for TNG, testified that he helped prepare a disclosure statement to the creditors in the bankruptcy case, together with TNG's outside lawyer, John Nabors. Stone said that part of the disclosure statement related to the liquidation value of TNG. Stone said that he did not believe the disclosure statement was accurate, that his figure was $700 or $720 million, and that Nabors told him the figure was too high. Moreover, Stone testified that Nabors told him to get the liquidation value under $500 million so the banks would not want to liquidate the company.[4] Stone testified that this was all done to avoid liquidation because "that is the last thing that Jack Stanley wanted, and the last thing that John Nabors wanted was a liquidation of the company. They wanted to go forward under the plan." Ultimately, Stone believed the final statement contained much misleading information, and Stone told Stanley and Nabors that he was not going to have his name associated with the document.

Stone also testified about three other dishonest accounting practices. The first, labeled the December 1988 price fraud, occurred when TNG president, Craig Shepard, ordered Davis to tear up original invoices and charge customers less than contract price. By tearing up the original invoices and charging less than the agreed price, TNG was able to avoid paying its creditors $2 million per month. The sec-

---

4. For example, Stone testified that Nabors specifically told him to assume a value of $70 or $80 million dollars for a refinery that was on the books at $800 million dollars.

ond accounting irregularity testified to at the BDS trial involved a company named Somex. Somex was a company set up, owned, and controlled by Stanley, which was supposed to sell pipe to TNG. Stone testified that money was being advanced to Somex to purchase material for TNG, but the material was never purchased. The third accounting irregularity testified to by Stone occurred when Stone discovered an accounting error that was overcharging severance taxes to royalty owners, resulting in underpayment to royalty owners. When Stone authorized a correction, he was called into Stanley's office and told "I was never again to make another change in accounting practice without his approval." Stone further stated that he made no further changes to the accounting policies because "Stanley was the chairman of the board, Mr. Stanley was the sole owner of the company, and when Jack Stanley tells you to do something, you do it."

We again note that the article specifically included Stanley's denial of all of the allegations against him. Most important, the article specifically stated that Stanley "had never heard the phrase 'cook the books' before." The gist of Stone's testimony was that Stanley's lawyer directed Stone to make use of deceptive numbers and misleading statements to the creditors to avoid liquidation and that this command was made with Stanley's full knowledge and approval.

Considering the testimony that Stanley was defrauding creditors and royalty owners, authorizing the destruction of documents, and the fact that the article specifically provided that Stanley never used the term "cook the books," we conclude the average reader would not ascribe a more venal intent to plaintiffs merely because the article stated Stanley directed his accountants to "cook the books."

We, therefore, conclude the trial erred in denying the motion for summary judgment on the basis of the fair, true, and impartial privilege contained in section 73.002 with regard to statement 3.

## Statement 4

**Millions of dollars were changing hands, and none of the money was going to the creditors.**

■ The paragraph itself states:

**Stone went down a long list of 'accounting irregularities' that he discovered after he took the job. The purpose of these irregularities, Stone told the jury, was to create a cash flow that would permit Stanley to expand his business outside the jurisdiction of the bankruptcy court. About the same time that Stanley filed for bankruptcy in 1983, Stone said, [TNG] formed an affiliated company called Southwest Texas Services. The purpose of the company, or so it appeared to Stone, was to divert money from creditors. Moreover, Stone discovered, the company was selling goods and services to [TNG] at inflated prices. Stone said that when he told Nabors and [TNG] president Craig Shepard that Southwest Texas Services was gouging the company, they told him to mind his own business. Within a few years, other suspect vendors and oil-field supply companies began to do business with [TNG].... 'What's irregular about it,' Stone explained, 'is that these companies were all controlled by or through Mr. Stanley.' Millions of dollars were changing hands, and none of the money was going to the creditors.**

Plaintiffs complain that this statement is not attributed to Stone and therefore not privileged. We disagree. The paragraph containing the statement has seven references to the fact that it was describing Stone's testimony. We believe an ordinary reader would recognize that the sentence at issue was clearly referring to Stone's testimony. Therefore, the privilege afforded in section 73.002 applies.

■ The BDS trial transcript, and Stone's testimony in particular, shows that TNG was charged with attempting to di-

vert funds to avoid creditors. We also note that TNG admitted this statement was true in its disclosure statement, which stated, "Prior to the filing of Chapter 11 petitions, in excess of $12 million was diverted away from and/or transferred out of debtors and placed in non-filed affiliates and subsidiaries for the purpose of allowing debtors to have available cash which would not be under the control of the bankruptcy court." Considering the statement in its proper context, we conclude the average reader would not ascribe a more venal intent to plaintiffs merely because of the statement that "millions of dollars were changing hands, and none of the money was going to the creditors" in light of the substantial testimony from Stone of accounting irregularities by plaintiffs.

We, therefore, conclude the trial court erred in denying the motion for summary judgment on the basis of the fair, true, and impartial privilege contained in section 73.002 with regard to statement 4.

### Statement 5

**Billy also told the *jury* that on his father's instructions he delivered large amounts of cash to South Texas wheeler-dealer Clinton Manges. Billy said that the money was supposed to be used to bribe former congressman Albert Bustamante of San Antonio, former railroad commissioner Lena Guerrero, Louisiana governor Edwin Edwards, and other politicians and judges.**

■ Defendants admit that the use of the word "jury" was inaccurate because that portion of Billy's testimony was directed to the judge, not the jury, as an offer of proof. Plaintiffs do not contend that Billy did not testify to the above-referenced testimony; rather, they contend the article was misleading because it failed to indicate that the judge excluded this testimony.

The fact that Billy's testimony was directed toward the judge instead of the jury would not affect the mind of the ordinary reader—whether Billy told the jury or the judge, the testimony was given in open court and the effect on the ordinary reader would be the same. We, therefore, conclude the trial court erred in denying the motion for summary judgment on the basis of the fair, true, and impartial privilege contained in section 73.002 with regard to statement 5.

### Statement 6

**[Billy Stanley] freely admits having operated a criminal enterprise from 1988 until 1992, the four years that he ran [TNG's] Laredo office for his father.**

■ Plaintiffs complain that the statement is inaccurate because Billy never "ran" the Laredo office. Plaintiffs complain that the statement suggests that Jack Stanley was "the evil brains behind his son's (criminal) enterprise." Because this is at least a plausible interpretation, plaintiffs argue, the jury is entitled to determine whether it is defamatory.

Billy did testify about the Laredo office. Billy testified that he worked with another employee at the Laredo office "to identify people that were to be laid off and to hire new people, identify managers that weren't being productive or, you know, had problems doing their work. I was also in charge of security and personnel." Most important, Billy testified that he was in charge of the Laredo operation. On direct examination, the following exchange occurred:

Q: Were you in charge of the Laredo operation?

A: *Yes.*

Q: During what period of time?

A: 1989 to 1992.

Q: During the time that you were involved down there, how many companies did you exercise control over?

A: Including the 22 companies?

Q: Yes, sir.

A: Twenty-six.

We conclude the statement is substantially true because the variance between the statement "Billy ran TNG's Laredo office" and "Billy was in charge of the Laredo operation" would not result in additional injury to plaintiffs' reputation.

▉ We now consider plaintiffs' argument that the statement is defamatory because it implies that Stanley was the "evil brains behind his son's (criminal) enterprise." The notion that a plaintiff can assert a cause of action for libel by implication, when the facts stated are substantially true, has been rejected by the supreme court. *See Randall's,* 891 S.W.2d at 646 (rejecting contention that statements, although literally true, were slanderous because *others might infer* dishonesty). Moreover, this Court has held "the implication of a true statement, however unfortunate, does not vitiate the defense of truth." *Hardwick v. Houston Lighting & Power Co.,* 943 S.W.2d 183, 185 (Tex. App.—Houston [1st Dist.] 1997, no writ).

We, therefore, conclude the trial court erred in denying the motion for summary judgment on the basis of the fair, true, and impartial privilege contained in section 73.002 with regard to statement 6.

In sum, the gist of the six statements referred to above and contained in the *Texas Monthly* article, when read in their entirety, appear to be a substantially fair, true, and impartial account of the judicial proceedings, as observed from the standpoint of the *Texas Monthly* reporter.[5]

We sustain points of error 1–13 and 15–17.

### Substantial Truth

▉ For any statement that is not privileged under Civil Practice and Remedies Code section 73.002, a showing that the defamatory communication was substantially true will defeat a libel cause of action. *Barbouti v. Hearst Corp.,* 927

S.W.2d 37, 64–65 (Tex.App.—Houston [1st Dist.] 1996, writ denied). To determine substantial truth, we are to "consider whether the statement was more damaging to the plaintiff's reputation, in the mind of the ordinary reader, than a true statement would have been." *Id.* at 65. In order to satisfy the "substantial truth" test, the article does not have to be 100 % accurate. *Id.* If the gist of the libel charge is undisputed, we will determine substantial truth as a matter of law. *McIlvain,* 794 S.W.2d at 16.

### Statement 7

**A federal judge ordered [TNG] to settle with Kolaya, which it did, for $1 million.**

▉ This statement is part of a description of a lawsuit brought by Monica Kolaya, a royalty owner, against TNG. The article explains that the state court found for Kolaya and rendered judgment for $1.7 million. Although plaintiffs do not contest the fact that TNG settled with Kolaya for over a million dollars, plaintiffs argue that federal judges are not empowered to "order" settlements and, therefore, the statement misrepresents what occurred. Moreover, plaintiffs argue the article implies that TNG had no alternative to settling when in fact TNG voluntarily settled.

In the first place, whether a federal judge actually ordered a settlement, or strongly recommended a settlement, is a distinction that would be lost on the ordinary reader. Second, the Kolaya record reflects that after the federal judge found TNG was culpable, he discussed the possibility of settlement with the parties. The federal judge specifically ordered counsel for Stanley to get Stanley on the phone and tell him "he's coming down here to settle this case or hear it." We conclude the statement "a federal judge ordered

---

5. Our review of the record also indicates that the issues raised in the *Texas Monthly* article had not ceased to be a matter of public concern when it was published in July 1995. Stanley and TNG's bankruptcy continued to receive public attention both before and after the article in places such as *Forbes,* the *Wall Street Journal, Corporate Finance,* the *Houston Chronicle,* and the *New York Times.*

TNG to settle with Kolaya, which it did, for $1 million" is not more damaging than the statement "a federal judge directed the parties to discuss settlement, and TNG settled its case with Kolaya for $1 million." Thus, the gist of the seventh statement, although not 100% accurate in every detail, is substantially true and not actionable.

We sustain point of error 14.

### Summary Judgment Proof

In points of error 19 and 20, defendants contend the trial court erred in sustaining plaintiffs' objections to the summary judgment evidence. The trial court sustained the objections to the summary judgment evidence insofar as it was offered for the truth of the matter asserted and overruled the objections insofar as these matters were offered as state-of-mind evidence. We conclude the trial court did not abuse its discretion in considering the summary judgment evidence for the limited purpose of state of mind. As such, this Court, in considering the merits of defendants' summary judgment, only considered the summary judgment evidence as state of mind evidence and not for the truth of the matters asserted therein.

We overrule points of error 19 and 20.

### Conclusion

We reverse the trial court's order denying summary judgment and render judgment that plaintiffs take nothing.[6] We order that each party is liable for and taxed its own costs of appeal. TEX. CIV. PRAC. & REM.CODE ANN. § 51.015 (Vernon 1997).

---

6. We decline to consider point of error 18 (actual malice) in light of our holding on the other points of error.