**Opinion issued December 18, 2014**



**In The**

# Court of Appeals

**For The**

# First District of Texas

————————————

**NO. 01-11-00765-CV**

————————————

**LEAANNE KLENTZMAN AND CARTER PUBLICATIONS, INC. D/B/A THE WEST FORT BEND STAR, Appellants**

**V.**

**WADE BRADY, Appellee**

On Appeal from the 240th District Court
Fort Bend County, Texas
Trial Court Case No. 03CV129531

**OPINION ON REHEARING**

Appellee, Wade Brady, sued appellants, Carter Publications, Inc. *d/b/a* The West Fort Bend Star ("The Star") and LeaAnne Klentzman, a reporter for The Star, alleging that they defamed him in a January 15, 2003 article ("the Article"). Based

on the jury's verdict in Wade's favor, the trial court signed its final judgment awarding him actual and exemplary damages. In nine issues, Klentzman and The Star argue that: (1) the trial court erred by ruling that neither the Article nor any of the particular complained-of statements reported on a matter of public concern; (2) the trial court erred by ruling that the Article and all complained-of statements were "of and concerning" Wade; (3) the trial court erred by submitting a question on defamatory impression without conditioning the question on a jury finding that each of the complained-of statements was true or substantially true; (4) the trial court erred by submitting a "libel per se" instruction, because libel per se is a question of law for the court to determine, and by improperly combining libel per se and libel per quod, impacting the burden of proof required for damages; (5) the trial court erred in submitting a "libel per se" instruction with the question on defamatory impression because Texas does not recognize the theory of "defamatory impression per se"; (6) the trial court erred by failing to rule that the Article and all complained-of statements were privileged under the "Fair Report Privilege" or the "Neutral Reportage Privilege," which would have required a finding of actual malice by clear and convincing evidence to overcome the privilege and impose liability; (7) the evidence is factually insufficient to support the jury's findings that the gist of the Article and the individual complained-of statements were not substantially true; (8) the evidence is factually insufficient to

2

support the jury's award of $20,000 for past mental anguish; and (9) the evidence is factually insufficient to support the jury's award of $30,000 for past injury to Wade's reputation.

Following the issuance of our October 17, 2013 opinion, in which we reversed the award of mental anguish damages on legal sufficiency grounds, remanded for reevaluation of punitive damages, and affirmed the remainder of the trial court's judgment, Klentzman and The Star moved for rehearing and en banc reconsideration. Accordingly, we grant the motion for rehearing and withdraw our opinion and judgment of October 17, 2013. We issue this opinion and judgment in their stead. We reverse and remand for a new trial.[1]

**Background**

## A.     The Article

Wade's father is Craig Brady, the Chief Deputy of the Fort Bend County Sheriff's Office ("FBCSO"). Craig and Klentzman both began working for the FBCSO in 1981, and both Klentzman and Craig acknowledged at trial that they had a tumultuous and negative relationship. After Klentzman left the FBCSO and began working as a news reporter, she wrote several articles that were critical of Craig, his performance at the FBCSO, and his alleged intervention on behalf of his

---

[1]     Our withdrawal and reissuance of our opinion and judgment renders Klentzman and The Star's motion for en banc reconsideration moot. *See Poland v. Ott*, 278 S.W.3d 39, 40–41 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

sons, Cullen and Wade Brady, regarding their various interactions with other law enforcement personnel, including FBCSO deputies.

On January 15, 2003, The Star published the Article that is the basis of this suit on its front page. It was entitled "Deputy Brady's Tape Collecting Called 'Roadside Suppression.'" The Article stated that Craig Brady "has been collecting audio tapes from deputies regarding a Minor in Possession charge that one of his sons faced early in 2001." It recounted details regarding the theft of Wade's cell phone, which "resulted in a police pursuit through the streets of Rosenberg with the chief deputy driving his unmarked police car" and "ended when the alleged robber crashed his car into someone's property."

The Article also recounted a third incident involving Wade and his brother, Cullen. The Article stated that "Brady's sons had led a DPS Trooper from the streets of Rosenberg winding down narrow roads all the way to their riverside home" and that "Wade Brady was so unruly and intoxicated that the Trooper had to handcuff him and place him in the backseat of the police car for safety."

The Article also mentioned Wade by name in reference to his 2001 citation for being a minor in possession of alcohol ("MIP") and his subsequent trial. Omitting any reference to the outcome of the trial, which resulted in Wade's acquittal on the MIP charge, the Article included several paragraphs detailing Craig's allegedly continuous interactions with the deputies involved in Wade's

4

MIP citation, including "numerous twilight meetings held in various parking lots scattered throughout the northwest quadrant of the county" that the Article claimed FBCSO personnel had dubbed "'roadside suppression hearings,' making jest of a legal maneuver by defense lawyers to keep evidence out of court."

> The rest of the Article was devoted to discussing an expunction order:
>
> While rehashing just a few of the events that have occurred over the past year it should be glaringly apparent why the officers involved in the MIP incident with Wade Brady were intimidated when their boss, Chief Deputy Craig Brady, notified them that he had an order of expunction and demanded any and all audio tapes or notes from that incident in their possession.

The Article further stated that "[t]here is some controversy over the validity of the order," recounting some statutory authority governing the issuance of expunction orders and quoting Texas Municipal Police Association ("TMPA") lawyer Larry McDougal as stating that "[b]ased on the law, this order is void" and that TMPA was going to file documents to get the order set aside. The Article also stated that Bud Childers, the county attorney at that time, opined that Craig "could not legally use that order to get the tapes from the officers." The Article concluded, "For now, the 'Roadside Suppression Hearings' have ended with personnel at the sheriff's office just wondering when the other shoe will drop."

## B.    The Trial

Wade filed suit against Klentzman and The Star on April 17, 2003, alleging defamation based on the Article. Klentzman and The Star moved for summary

5

judgment on the bases that there was no evidence of the material falsity of any of the statements in the Article, that there was no evidence of actual malice, and that a portion of the Article was an expression of opinion and not actionable as defamation. The trial court denied the motion for summary judgment, and Klentzman and The Star pursued an interlocutory appeal in this Court. This Court affirmed the trial court's order denying the motion for summary judgment. *See Klentzman v. Brady*, 312 S.W.3d 886, 891 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (affirming denial of summary judgment) (hereinafter "*Klentzman I*"). The case proceeded to a jury trial on Wade's defamation claims.

At trial, Wade presented evidence regarding the various events that were recounted in the Article. The evidence established that, in May 28, 2000, when Wade was sixteen years old, his cell phone was stolen. Craig testified that after Wade reported the theft of the phone to him, he created an offense report and took action to locate the suspected thief. Craig located the suspect using the license plate number obtained by Wade during the theft and followed the suspect, who was "driving maybe 5 miles an hour," until a marked police car arrived. The suspect hit Craig's car and was "forced . . . to take a turn onto a side road," at which point the suspect jumped out of the car while it was still moving. The car "struck a man's house, but didn't cause any damage to it." Craig further testified that the

incident was not an "alleged robbery" as stated in the Article, because the suspect was arrested and later convicted of theft.

The evidence at trial also demonstrated that, on February 10, 2001, Wade received an MIP citation from a FBSCO deputy. Craig testified that Cullen, his oldest son, who was twenty-one at that time, had been at the beach with friends when an intoxicated third party struck his truck and "disabled" it. Wade drove to Galveston to pick Cullen up and loaded Cullen's property, including a cooler, into the truck. The boys returned home around 3:00 a.m. Later that same day, Wade left to meet friends at a restaurant without removing the cooler, which contained several beers. He was pulled over by FBSCO deputies and was given an MIP citation.

Craig testified that, after Wade had received the ticket and returned home, Wade told him that the FBCSO deputy who cited him was rude to him and used profanity. Craig testified that he met with the deputies involved in the MIP citation one time each to discuss what happened during the MIP stop. He stated that he chose the location of the meetings—at gas stations within the deputies' patrol areas—for the convenience of the deputies and that the meetings lasted "maybe ten minutes." He testified that he discussed the use of profanity with Deputy Costello, one of the deputies involved in the MIP citation, and Costello told him that he directed the profanity toward another officer, not toward Wade. Craig testified that

7

the sheriff also requested a meeting with the deputies involved "[t]o reassure all the deputies involved that they weren't in trouble and there was going to be no repercussions because they had given my son a citation."

The deputies involved in the MIP citation testified that, in spite of their meeting with Craig, they testified fully and truthfully at Wade's MIP trial. They each testified that they did not withhold any testimony or other evidence during the trial, and they further stated that Craig never asked them to do so.

A jury acquitted Wade on the MIP charge. On September 23, 2002, Wade moved for an expunction. The Justice of the Peace issued the expunction order on November 21, 2002. Craig testified that he did not demand the return of the tapes from any of the deputies involved in the MIP charge. The deputies each testified that they either personally destroyed the tapes pursuant to the court order of expunction or turned the evidence over to other personnel for destruction pursuant to the order.

Regarding the statements in the Article concerning the validity of the expunction order, TMPA lawyer Larry McDougal testified that he was misrepresented in the Article. He did not opine on the validity of Wade's expunction order, and, to his knowledge, the TMPA was not involved in any way in seeking to void the order. Bud Childers also testified that his comments were misstated in the Article. He also stated that he did not form or express any opinion

on the validity of Wade's expunction order and that his statement about the scope of an expunction order was based on a very narrow hypothetical posed by Klentzman and not on the facts of Wade's case.

Finally, regarding the incident that occurred in Brady's driveway, Wade testified that he was not intoxicated and unruly, as the Article claimed. He testified that he complied with the DPS trooper and the incident ended without any citations or arrests being made. Wade also submitted a video recording of the DPS trooper's stop of Cullen and himself, which showed the interaction between Cullen, Wade, and the trooper. Craig was not present at any point during Wade's interaction with the DPS trooper.

Wade testified at trial that he was concerned that people were thinking poorly of him based on the Article. He testified that he knew other people were talking about the Article when his boss asked him to quit his job. He acknowledged that he was eventually able to return to his employment at the same organization. He also testified that his friends talked about the Article and let him know that other people in the community were talking about the Article and thought that it made Wade "look like a criminal" whose father would "get [him] out of trouble." Wade also testified about how the Article's publication changed his behavior: "Anytime I would meet somebody, I would wonder if it was somebody that had read this article and thought I was a bad person. And

9

sometimes I still think that whenever I meet somebody." He testified that he did not see a doctor about his condition after the Article's publication because he is "not the kind of person to talk about [his] feelings" and he found it "embarrassing"; rather, he "hid." Wade also testified that he gained thirty pounds and that the Article "actually affected [him] until about five years ago."

Wade's mother Jackie testified that the publication of the article "bothered him a lot." She stated, "He seemed to get more withdrawn. He seemed to sort of stay to himself a lot. He has stayed around the house more. It seemed like he just put on some weight." She also testified that Wade seemed depressed and talked to her about having weird dreams. She and Craig discussed the possibility of Wade's seeing a therapist, but Wade refused.

At the close of Wade's case, Klentzman and The Star moved for a directed verdict, arguing, among other things, that the Article addressed a matter of public concern, thus requiring Wade to prove falsity and actual malice to be entitled to damages. They also argued that neither the Article as a whole nor all of the complained-of statements were "of and concerning" Wade and that Klentzman and The Star were entitled to certain privileges protecting the reporting of newsworthy events which would also require Wade to prove actual malice. The trial court denied their motion for directed verdict. Klentzman and The Star also filed written objections to the charge and proposed jury questions addressing their complaints

10

regarding various errors in the jury charge, including, among others, jury questions that placed the burden for proving falsity on Wade and questions using the actual malice standard for fault. The trial court denied Klentzman and The Star's objections to the jury charge.

The case was submitted to the jury.

## C.   The Jury Charge

Question 1 asked the jury: "Did the Article as a whole, and not merely individual statements contained in it, either by omitting certain material facts or by suggestively juxtaposing facts in a misleading way, create a substantially false and defamatory impression of Plaintiff Wade Brady?" It also defined "false" as meaning "that the impression created, if any, is not literally true or not substantially true." Question 1 also instructed that "[a]n impression is not 'substantially true' if, in the mind of the average person, the gist of the impression is more damaging to the person affected by it than a literally true impression would have been." The question also defined "defamatory." Additionally, the instruction stated, "[A] 'defamatory' statement is 'libel per se' if it falsely charges a person with the commission of a crime." The jury answered, "Yes."

In response to Questions 2 and 3, the jury found that Klentzman and The Star, respectively, knew or should have known, "in the exercise of ordinary care,

11

that the impression created by the Article was false and had the potential to be defamatory."

Question 4 listed twenty-one specific "Complained of Statements" from the Article and asked: "Do you find that any of the individual statements of fact listed below from the Article . . . were defamatory concerning Wade Brady?" It again defined "defamatory" and "libel per se." The jury answered, "Yes," finding that at least one of the individual complained-of statements was defamatory concerning Wade.

Question 5 asked: "Were all the defamatory statements from the list of Complained of Statements referenced in Question 4 substantially true at the time they were made as they related to Wade Brady?" The question defined "substantially true" as meaning a statement "that varies from the literal truth in only minor details or if, in the mind of the average person, the gist of it is no more damaging to the person affected by it than a literally true statement would have been." The jury answered, "No."

In response to Questions 6 and 7, the jury found that Klentzman and The Star, respectively, knew or should have known, "in the exercise of ordinary care, that any of the Complained of Statements were false and had the potential to be defamatory."

12

In Question 8, the jury was instructed to consider only three isolated statements recounting facts related during Wade's MIP trial that the trial court had determined were protected by privilege. The three statements from the Article that were identified in Question 8 were not included in the complained-of statements identified by Wade in his pleadings or in Question 4 relating to the specific complained-of statements. Question 8 then asked whether the jury found "by clear and convincing evidence that, at the time the Article was published, [Klentzman and the Star] knew the [three privileged] statements were false as they related to Wade Brady, or that [they] made the above statements with a high degree of awareness that they were probably false, to the extent that [they] in fact had serious doubts as to the truth of the above statements." The jury answered "No" for both Klentzman and the Star.

Question 9 addressed the issue of damages, asking what sum of money would compensate Wade Brady for his injuries, if any, that were proximately caused as a result of the publication of the Article. In relevant part, the jury was instructed, "If you have found in answering Questions 1 or 4 that there was 'libel per se,' you must award at least nominal damages for injury to reputation in the past." The jury awarded Wade $30,000 for past injury to his reputation and $20,000 for past mental anguish. The jury charge never asked the jury to make a separate determination regarding whether the Article or the complained-of

statements were defamatory per se, it did not define "nominal damages," and it did not instruct the jury on the issue of defamation per quod.

In response to Question 10, the jury found that "the harm to Plaintiff Wade Brady resulted from malice by Klentzman," where the charge defined malice as either "specific intent by Klentzman to cause substantial injury to" Wade or an act or omission by Klentzman that involved an extreme degree of risk or of which Klentzman had "actual, subjective awareness of the risk involved, but nevertheless proceed[ed] with conscious indifference to the rights, safety, or welfare of others." In response to Question 11, the jury awarded Wade $30,000 in exemplary damages against Klentzman.

In response to Question 12, the jury found that the harm to Wade did not result from "malice by The Star." However, it found in response to Question 13 that the harm to Wade "resulted from malice attributable to The Star." In response to Question 14, it awarded Wade $1,000,000 in exemplary damages against The Star.

The trial court rendered judgment on the jury's verdict, awarding Wade $50,000 in actual damages against Klentzman and The Star, jointly and severally; $30,000 in punitive damages against Klentzman; $200,000 in punitive damages against The Star; $47,741.50 in attorney's fees associated with the interlocutory

14

appeal taken in the case; costs; and pre- and post-judgment interest. This appeal followed.

## Legal Rulings

In their first, second, third, and sixth issues, Klentzman and the Star complain that certain legal rulings by the trial court resulted in a defective jury charge that probably caused the rendition of an improper judgment, requiring reversal. We first address those rulings to determine whether they caused submission of the case to the jury on an incorrect charge.

### A. Standard of Review of Legal Rulings

Appellate courts review legal determinations de novo. *Reliance Nat'l Indem. Co. v. Advance'd Temps., Inc.*, 227 S.W.3d 46, 50 (Tex. 2007). "What might otherwise be a question of fact becomes one of law when the fact is not in dispute or is conclusively established." *Id.* Because a trial court has no discretion in determining what the law is, which law governs, or how to apply the law, we review this category of rulings de novo. *Okorafor v. Uncle Sam & Assocs., Inc.*, 295 S.W.3d 27, 38 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006), and *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992)).

However, when the ruling under review results from the trial court's having resolved underlying facts, we must defer to the trial court's factual resolutions and

15

any credibility determinations. *Id.*; *see also Reliance Nat'l Indem. Co.*, 227 S.W.3d at 50 (holding that factual determinations receive more deferential review based on sufficiency of evidence); *Bentley v. Bunton*, 94 S.W.3d 561, 597 (Tex. 2002) ("On questions of law we ordinarily do not defer to a lower court at all. But the sufficiency of disputed evidence to support a finding cannot be treated as a pure question of law when there are issues of credibility."). Challenges to the legal sufficiency of the evidence may only be sustained when: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is not more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).

## B.     Privilege

In their sixth issue, Klentzman and The Star argue that the trial court erred in failing to rule that the Article and complained-of statements were privileged under the "Fair Report Privilege" or the "Neutral Reportage Privilege." They argue that the Article as a whole and the individual complained-of statements were privileged, and, thus, Wade was required to establish "actual malice" by clear and convincing evidence to overcome the privilege.

Conditional privileges, like the fair report privilege as it is recognized at common law and in the Civil Practice and Remedies Code, "arise out of the occasion upon which the false statement is published" and are "based on public policy concerns which elevate the good to be accomplished by the free and open exchange of information over the harm which may result from a falsehood." *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 768 (Tex. 1987); *Writt v. Shell Oil Co.*, 409 S.W.3d 59, 66 (Tex. App.—Houston [1st Dist.] 2013, pet. granted) (citing RESTATEMENT (SECOND) OF TORTS ch. 25, title B, intro. note (1977)); *see also Neely v. Wilson*, 418 S.W.3d 52, 69 (Tex. 2013) (discussing "conditional judicial proceedings privilege" outlined in Civil Practice and Remedies Code section 73.002); *Langston v. Eagle Pub. Co.*, 719 S.W.2d 612, 624 (Tex. App.—Waco 1986, writ ref'd n.r.e.) (identifying Texas's statutory fair report privilege as "a qualified or conditional privilege"). To prevail on a defamation claim when a conditional privilege applies, the plaintiff must establish that the privilege was abused, i.e., that the person making the defamatory statement knew the statement was false or did not act for the purpose of protecting the interest for which the privilege exists. *Hurlbut*, 749 S.W.2d at 768; *Writt*, 409 S.W.3d at 66.

The Star asserted the qualified privilege based on Civil Practice and Remedies Code section 73.002(b)(1)(A) and (b)(2). Section 73.002 provides:

17

(a) The publication by a newspaper or other periodical of a matter covered by this section is privileged and is not a ground for a libel action. . . .

(b) This section applies to:

(1) a fair, true, and impartial account of:

(A) a judicial proceeding . . . ; and

(2) reasonable and fair comment on or criticism of an official act of a public official or other matter of public concern published for general information.

TEX. CIV. PRAC. & REM. CODE ANN. § 73.002 (Vernon 2005); *see also Denton Publ'g Co. v. Boyd*, 460 S.W.2d 881, 883 (Tex. 1970) (holding that article in question would be privileged under predecessor statute to section 73.002 "as long as it purported to be, and was, only a fair, true and impartial report of what was stated at the meeting, regardless of whether the facts under discussion at such meeting were in fact true, unless the report was made with actual malice").

The privileges outlined by section 73.002 are similar to the privilege recognized in the Restatement (Second) of Torts, which provides that "[t]he publication of a defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported." RESTATEMENT (SECOND) OF TORTS § 611 (1977); *see also Boyd*, 460 S.W.2d at 883–84 (citing, in part, Restatement section

18

611 in analyzing privilege under predecessor statute to section 73.002); *Freedom Commc'ns, Inc. v. Sotelo*, No. 11-05-00336-CV, 2006 WL 1644602, at \*3 (Tex. App.—Eastland June 15, 2006, no pet.) (mem. op.) (discussing Restatement section 611). The privilege "extends to the report of . . . any action taken by any officer or agency of the government of the United States, or of any State or of any of its subdivisions." RESTATEMENT (SECOND) OF TORTS § 611 cmt. d; *Sotelo*, 2006 WL 1644602, at \*3. However, "[t]he reporter is not privileged under this Section to make additions of his own that would convey a defamatory impression." RESTATEMENT (SECOND) OF TORTS § 611 cmt. f; *Sotelo*, 2006 WL 1644602, at \*3.

Where the facts are undisputed and the language used in the publication is not ambiguous, the question of privilege is one of law for the court. *Boyd*, 460 S.W.2d at 884; *Sotelo*, 2006 WL 1644602, at \*3. To determine whether a media defendant's account of a judicial proceeding is "fair and impartial," it must be interpreted in the sense that the ordinary reader would understand; the statutory requirement that the published account be true is satisfied if it is substantially correct. *Tex. Monthly, Inc. v. Transam. Natural Gas Corp.*, 7 S.W.3d 801, 805 (Tex. App.—Houston [1st Dist.] 1999, no pet.). The substantial truth test involves consideration of whether the alleged defamatory statement was more damaging to the plaintiff's reputation in the mind of the average listener than a truthful statement would have been. *Id.*

Thus, an article is a "fair, true, and impartial" account "in reference to the court record . . . [i]f the effect on the reader's mind would be the same [and] any difference between the statements made in the record and the media account of the proceeding should be disregarded." *Id.* at 807. Under section 73.002(b)(2), the proper comparison should be between a news report or broadcast and an otherwise unprivileged record of the state or federal government. *Sotelo*, 2006 WL 1644602, at *5.

Here, the Article contains references to Wade's MIP charge, his ensuing trial on that charge, and an expunction order. However, it does not state at any point that a jury acquitted him of the MIP charge. Because the Article omitted that key information regarding the judicial proceedings, it was not a fair, true, and complete account as it related to Wade. Interpreted in the sense that the ordinary reader would understand, this omission—that Wade was acquitted of the charge against him—was more harmful to Wade's reputation in the mind of the average listener than a truthful statement would have been. *See Tex. Monthly, Inc.*, 7 S.W.3d at 805. The Article also addressed other details regarding Wade's conduct that could not be considered a "reasonable and fair comment" on Chief Deputy Craig Brady's alleged "roadside suppression hearings." *See Boyd*, 460 S.W.2d at 883 (holding that article is privileged only if it purports to be and actually is fair, true, and impartial report).

Thus, we disagree with Klentzman and The Star that they satisfied their burden of establishing their entitlement to privilege under section 73.002(b). Because we hold that no privilege applies here, Wade need not prove actual malice to prevail on his defamation claim and recover actual damages. *See Hurlbut*, 749 S.W.2d at 768 (holding that plaintiff must prove actual malice to overcome conditional privilege). We overrule Klentzman and The Star's sixth issue.

## C.     Statements "Of and Concerning" Wade Brady

In their second issue, Klentzman and The Star argue that the trial court erred in ruling that the Article and complained-of statements were "of and concerning" Wade. Specifically, Klentzman and The Star argue that the trial court's ruling that the Article as a whole was "of and concerning" Wade was "contrary to this Court's prior ruling [in the interlocutory appeal] . . . that the gist of the Article was about Chief Deputy Craig Brady." They also complain of the trial court's ruling "that *all* of the Complained-of Statements were 'of and concerning' [Wade] when, on their face, many of the challenged statements did not refer to or concern him at all." They argue that the trial court's erroneous ruling that the Article and complained-of statements were of and concerning Wade constituted reversible error because it resulted in the submission of liability questions on non-actionable statements.

We construe an allegedly defamatory publication as a whole in light of the surrounding circumstances and based upon how a person of ordinary intelligence

21

would perceive it. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000); *Main v. Royall*, 348 S.W.3d 381, 390 (Tex. App.—Dallas 2011, no pet.). A "person of ordinary intelligence" is one who "exercises care and prudence, but not omniscience, when evaluating allegedly defamatory communications." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004); *Main*, 348 S.W.3d at 390.

"A defamatory statement must be directed at the plaintiff as an ascertainable person to be actionable." *Vice v. Kasprzak*, 318 S.W.3d 1, 13 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Newspapers Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960), and *Cox Tex. Newspapers, L.P. v. Penick*, 219 S.W.3d 425, 433 (Tex. App.—Austin 2007, pet. denied)). To maintain a defamation action, a plaintiff must be referenced in the complained-of statement. *Id.* (citing *Newspapers, Inc.*, 339 S.W.2d at 893). Whether a plaintiff is referenced in a statement is a question of law. *Id.* A publication is "of and concerning the plaintiff" if persons who knew and were acquainted with him understood from viewing the publication that the defamatory matter referred to him. *Id.* (citing *Allied Mktg. Grp., Inc. v. Paramount Pictures Corp.*, 111 S.W.3d 168, 173 (Tex. App.—Eastland 2003, pet. denied), and *Newspapers, Inc.*, 339 S.W.2d at 894).

It is not necessary that the plaintiff be specifically named in the communication to be defamatory. *Id.* (citing *Penick*, 219 S.W.3d at 433 and *Allied*

22

*Mktg. Grp.*, 111 S.W.3d at 173).  The plaintiff need not prove that the defendant intended to refer to him.  *Id.*  "A defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer."  *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 564 (1977)).  The false statement must point to the plaintiff and no one else.  *Id.*

Here, the Article, including some of the complained-of statements, mentioned Wade by name.  The Article recounted, over the space of several paragraphs, details regarding the theft of Wade's cell phone, the circumstances surrounding his MIP charge, and details regarding another interaction Wade had with a DPS trooper in his driveway.  The Article mentioned Wade by name more than once, mentioned his MIP trial, and stated that an expunction order pertaining to his MIP charge had been issued.  These statements point to Wade and no one else.  *See id.* (holding that publication is "of and concerning" plaintiff if it can be understood from viewing publication that defamatory matter referred to plaintiff).

The trial court's conclusion that the Article and complained-of statements were "of and concerning" Wade does not conflict with this Court's prior interpretation of the "gist" of the Article.  Klentzman and The Star are correct that we stated in *Klentzman I* that Craig Brady was the "target" of the Article and that the gist of the Article was that Craig Brady "in an effort to help his son, Wade,

23

abused his official position by intervening on his son's behalf in an effort to 'suppress' evidence." *Klentzman I*, 312 S.W.3d at 901. However, we also acknowledged that the Article contained "many extraneous details and digressions" and "many details regarding Wade's encounters with law enforcement." *Id.* We specifically "[did] not address whether, and, if so, to what extent, the Article was 'of and concerning' Wade." *Id.* at 901 n.16. We then affirmed the trial court's denial of Klentzman's motion for summary judgment on the basis that Wade raised a genuine issue of material fact as to whether the "gist" of the Article was false and as to whether the "gist" of the Article was more damaging to Wade's reputation that the truth. *Id.* at 901–03.

Our opinion in *Klentzman I* reflected that both Wade Brady and Chief Deputy Craig Brady were referenced in the Article, and the opinion contemplated Wade's ability to establish Klentzman's and The Star's liability for defamation of him in the Article. The fact that the Article also discussed the actions of other people in addition to Wade does not prohibit it from being defamatory concerning Wade. *See Sellards v. Express-News Corp.*, 702 S.W.2d 677, 680 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) (holding that allegedly defamatory article about car crash was "of and concerning" one of several passengers, even though she was not mentioned by name, and stating, "When a group is named and the plaintiff is a readily identifiable member of the group, a cause of action for

24

defamation exists if those who know and are acquainted with the plaintiff understand the article refers to the plaintiff").[2]

Thus, the trial court did not err in concluding that the Article was "of and concerning" Wade Brady.

We overrule Klentzman and The Star's second issue.

### D. Order of Questions

In their third issue, Klentzman and The Star argue that the trial court erred by submitting a question on Wade's claim of defamatory impression without conditioning it on jury finding that each of the complained-of statements was true or substantially true.[3]  They cite *Turner v. KTRK Television, Inc.* to support their

---

[2]    Klentzman and The Star also argue that the trial court erred in concluding "that *all* of the complained-of statements were 'of and concerning' Brady when, on their face, many of the challenged statements did not refer to or concern him at all." Specifically, they identify only twelve of the twenty-one complained-of statements listed in Question 4, which asked whether "any" of the individual complained-of statements were defamatory concerning Wade Brady.  However, they do not assign any error in this issue to the other statements included in the charge, each of which could have served as an independent basis to support the jury's answer. And, we ultimately sustain Klentzman and The Star's first issue and conclude that the case must be reversed and remanded for a new trial.  Thus we do not address these arguments on appeal.

[3]    Wade again argues in his brief on appeal that Klentzman and The Star waived this complaint by failing to object to the charge on this ground.  However, Klentzman and The Star's written objections to the charge included an objection "to the order of questions: defamation instructions and question should be placed before defamatory impression instructions and question."  In their written objections, Klentzman and The Star argued that "the question and instructions for defamation should be submitted to the jury first, before the question and instructions for defamatory impression.  A finding that the complained-of statements . . . create a

25

argument.  *See* 38 S.W.3d at 114.  However, nothing in the supreme court's analysis in *Turner* indicates that a plaintiff cannot recover for both the defamatory impression caused by an article as a whole and for individual false and defamatory statements.  Klentzman and The Star further contend that the trial court erred in failing to submit to the jury a question addressing the falsity or substantial truth of the individual complained-of statements before the question addressing the defamatory impression created by the Article as a whole.  We conclude that this argument has no merit.

The *Turner* court stated, "Because a publication's meaning depends on its effect on an ordinary person's perception, . . . a publication can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory."  *Id.*  It held that "the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements."  *Id.* at 115.  Thus, "while all the statements in a publication may be true when read in isolation, the publication may nevertheless convey a substantially false and defamatory impression by omitting material facts or suggestively juxtaposing true facts."  *Id.*

---

false and defamatory impression before they are determined to be false and/or defamatory is improper."  Accordingly, this complaint is properly before the Court.  *See Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007).

26

Accordingly, the *Turner* court held that the substantial truth doctrine precludes liability when a publication correctly conveys a story's "gist" or "sting," although it errs in the details, but that Texas law permits liability when a publication gets the details right but does not put them in the proper context and gets the gist wrong. *Id.*; *see also Neely*, 418 S.W.3d at 63–64 ("Assessing a broadcast's gist is crucial. A broadcast with specific statements that err in the details but that correctly convey the gist of a story is substantially true."). Thus, to find that the gist of the article is defamatory, the trial court or jury does not need to determine the substantial truth of the individual statements; rather, a finding that the gist was defamatory requires only that details be omitted or juxtaposed in a way that conveys a defamatory impression. *Turner*, 38 S.W.3d at 115. Turner did not address allegations like those in this case that not only were individual statements false and defamatory but also the impression, or gist, created by the omission or juxtaposition of certain details was false and defamatory. Klentzman and The Star do not cite any authority indicating that Wade could not allege a cause of action for defamation on both of these bases.

Klentzman and The Star also rely on *Wheeler v. New Times, Inc.*, 49 S.W.3d 471 (Tex. App.—Dallas 2001, no pet.). However, *Wheeler* is factually distinguishable from the present case. Wheeler, a rental property owner, claimed that it was defamed in a portion of a newspaper article criticizing the City of

27

Dallas's urban rehabilitation and building code enforcement in certain poor minority communities. *Id.* at 473. The court stated that the plaintiffs "contend the facts are inaccurate and the article was not substantially true," but they did not allege, as in *Turner*, that the "article 'got the details right but fail[ed] to put them in the proper context, thereby getting the "gist" wrong.'" *Id.* at 476. Thus, the court in *Wheeler* determined that *Turner* was not controlling. *Id.* It went on to hold that the gist of the publication did not concern the Wheeler plaintiffs and the article was not defamatory of them. *Id.*

Here, Wade alleged both that individual statements were false and defamatory and that the Article omitted key facts and juxtaposed other facts in such a way that it created a defamatory impression in the mind of a reasonable reader. However, there is no requirement in *Turner* or in other Texas law that the gist of an article may be false only if the individual statements made in the article are true.

Klentzman and The Star have failed to demonstrate that their proposed jury charge—submitting a question addressing the falsity or substantial truth of the individual complained-of statements before the question addressing the defamatory impression created by the Article as a whole as a condition of reaching the second question—was required by a valid legal theory. *See Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 653 (Tex. App.—Dallas 2002, pet. denied) (holding

28

that we reverse if trial court denied proper submission of valid theory of recovery raised by pleadings and evidence) (citing *Exxon Corp. v. Perez*, 842 S.W.2d 629, 631 (Tex. 1992) (per curiam)).

We overrule Klentzman and The Star's third issue.

## Matter of Public Concern

In their first issue, Klentzman and The Star argue that the trial court erred in concluding that the Article was not reporting on a matter of public concern. They argue that the Article's content, form, and context deal with issues of law enforcement, criminal activity, and related judicial proceedings, which are all matters of public concern. They further argue that, as a result of this legal error, the jury charge was improperly submitted, such that Wade failed to secure jury findings on the falsity of the statements published in the Article or on either actual damages or malice, as required for a private individual to recover actual and punitive damages in a case brought against a media defendant for statements regarding a matter of public concern.

Wade argues that the Article does not address a matter of public concern. He relies in part on our holding in *Klentzman I* that he had not involved himself in a public *controversy* and thus was not a limited-purpose public figure and on cases analyzing what constitutes a public controversy for purposes of determining a plaintiff's status as a public or private figure. Wade also argues that, to the extent

29

the Article related details about Wade personally, it did not report on matters of public concern. Therefore, he argues, the damages award was proper.

## A.    Law Regarding Matters of Public Concern

Whether a plaintiff is a limited-purpose public figure who has involved himself in a public controversy and whether an article addresses a matter of public concern are two separate legal inquiries with their own implications for defamation law.

Whether a publication involves a matter of public concern is a question of law. *See Rankin v. McPherson*, 483 U.S. 378, 385–86 & n.9, 107 S. Ct. 2891, 2897–98 & n.9 (1987); *Scott v. Godwin*, 147 S.W.3d 609, 618 (Tex. App.—Corpus Christi 2004, no pet.). Appellate courts review legal determinations de novo. *Reliance Nat'l Indem. Co.*, 227 S.W.3d at 50.

In considering whether the Article addressed a matter of public concern, we examine "all the circumstances of the case." *See Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011); *see also Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 474 (Tex. 1995) ("The determination whether a given matter is one of legitimate public concern must be made in the factual context of each particular case, considering the nature of the information and the public's legitimate interest in its disclosure."). "[S]peech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection.'" *Snyder*, 131 S. Ct. at 1215 (quoting *Dun & Bradstreet,*

*Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59, 105 S. Ct. 2939, 2944–45 (1985) (plurality op.)). Because "speech concerning public affairs . . . is the essence of self-government," the First Amendment protects such speech on the principle that "debate on public issues should be uninhibited, robust, and wide-open." *Id.* (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S. Ct. 209, 216 (1964), and *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 721 (1964)).

The Supreme Court has held that "[s]peech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community'" or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id.* at 1216 (quoting *Connick v. Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 1690 (1983), and *City of San Diego v. Roe*, 543 U.S. 77, 83–84, 125 S. Ct. 521, 526 (2004)).

In deciding whether speech is of public or private concern, courts must examine the content, form, and context of the speech as revealed by the whole record. *Id.* (citing *Dun & Bradstreet*, 472 U.S. at 761, 105 S. Ct. at 2946, and *Connick*, 461 U.S. at 147–48, 103 S. Ct. at 1690). "In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all of the

circumstances of the speech, including what was said, where it was said, and how it was said." *Id.*

Courts have routinely held that matters related to the reporting of crimes and related proceedings are matters of public concern. *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492, 95 S. Ct. 1029, 1045 (1975) ("The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions . . . are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government."). Likewise, the activities of government officials and law enforcement personnel are matters of public concern. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 769, 776, 106 S. Ct. 1558, 1560, 1563 (1986) (holding that newspaper's articles asserting that private businessman had links to organized crime that he used to influence governmental processes were on issues of public concern); *Connick*, 461 U.S. at 148, 103 S. Ct. at 1691 (holding that speech seeking to "bring to light actual or potential wrongdoing or breach of public trust" by government official constitutes speech on matter of public concern); *Brawner v. City of Richardson*, 855 F.2d 187, 191–92 (5th Cir. 1988) (holding that alleged misconduct by public officials, particularly by law enforcement officials, is matter of public concern).

However, when details about the lives of private citizens are reported in a publication on a matter of public concern, the Texas Supreme Court has held that there must be a "logical nexus" between the private facts disclosed and the general subject matter. *Star-Telegram, Inc.*, 915 S.W.2d at 474; *accord Lowe v. Hearst Commc'ns, Inc.*, 487 F.3d 246, 251 (5th Cir. 2007) (declining "to get involved in deciding the newsworthiness of specific details in a newsworthy story where the details were 'substantially related' to the story"). This "logical nexus" test was intended to protect the privacy and reputational interests of private citizens without causing "an unacceptable chilling effect on the media itself," thereby serving the legitimate public interest in allowing media outlets to cover matters of public concern. *Star-Telegram, Inc.*, 915 S.W.2d at 474–75.

### 1. *Public figure analysis in Klentzman I does not preclude ruling that Article addresses matter of public concern*

In *Klentzman I*, we considered Klentzman and The Star's argument that Wade was a limited-purpose public figure. 312 S.W.3d at 904–08. Our analysis considered the "character of the plaintiff as a private or public figure rather than the nature of the subject-matter at issue." *Id.* at 904 (citing *Times, Inc. v. Firestone*, 424 U.S. 448, 455–56, 96 S. Ct. 958, 966 (1976)). We observed that limited-purpose public figures are persons who "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. . . ." *Id.* We applied the three-part test for determining whether Wade

33

was a limited-purpose public figure, which includes a requirement that "the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution." *See id.* at 904–05 (providing that other elements are that plaintiff had more than trivial role in controversy and that alleged defamation must be germane to plaintiff's participation in controversy) (citing *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)).

We concluded that the summary judgment evidence did not support a finding that there was any public controversy involving "people discussing a real question . . . the resolution of which was likely to impact persons other than those involved in the controversy." *Id.* at 905. We concluded that Wade was not a limited-purpose public figure. *Id.* at 906–07. However, we stated that we were not considering the separate question of whether the Article raised a matter of public concern because Klentzman and The Star did not argue to the trial court in the summary judgment proceeding that the allegedly defamatory statements made by Klentzman and The Star involved a matter of public concern as opposed to involving a public controversy. *Id.* at 907 n.20.

We went on to recognize in *Klentzman I* that the standard for determining whether a defamatory statement involves a matter of public concern requires a different analysis than determining whether a statement addresses a "public

controversy" that would elevate a private citizen to a limited-purpose public figure. *Compare Snyder*, 131 S. Ct. at 1216 (stating that "[s]peech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community'" or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public"), *and Klentzman I*, 312 S.W.3d at 898 (holding that when defamatory statement involves matter of public concern, even private individual must prove malice to recover presumed or punitive damages against media defendant), *with McLemore*, 978 S.W.2d at 572 (stating that public controversy exists, for purposes of determining whether plaintiff was limited-purpose public figure, if "persons actually were discussing some specific question" and that "[a] general concern or interest will not suffice").

Also, the standard for determining whether a statement involves a matter of public concern potentially includes a broader range of topics. For example, while an alleged criminal or crime victim may not be involved in a public controversy that would make him a limited-purpose public figure, an article or statement addressing the crime may nevertheless involve a matter of public concern. *See Hepps*, 475 U.S. at 769, 776, 106 S. Ct. at 1560, 1563 (holding that newspaper's articles asserting that private businessman had links to organized crime that he used to influence governmental processes were on issues of public concern); *Star-*

35

*Telegram, Inc.*, 915 S.W.2d at 474 (holding that personal details identifying rape victim, when viewed in their full context, although private, nonetheless served legitimate public concern).

Thus, to the extent that Wade relies on the holding in *Klentzman I* that he was not a limited-purpose public figure, and on cases analyzing whether a plaintiff is involved in a public controversy for purposes of determining his status as a private or public figure, those arguments are unavailing in determining whether the Article addressed a matter of public concern and is therefore subject to a higher standard of proof with respect to presumed and punitive damages.

### 2. *The Article addresses a matter of public concern*

We turn now to an analysis of the Article's content, form, and context as revealed by the whole record to determine whether it can "be fairly considered as relating to any matter of political, social, or other concern to the community" or whether it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *See Snyder*, 131 S. Ct. at 1216.

The Article, which was published in a public form as a news article in a local newspaper, contained reports of the theft of Wade's cell phone by an unidentified individual, details of Wade's MIP citation, related investigations and proceedings, interactions between law enforcement officers and Wade and his brother Cullen, and, significantly, official conduct on the part of Chief Deputy

36

Craig Brady in all of these circumstances. As discussed above, we held in *Klentzman I* that Chief Brady was the target of the Article and that the subject of the Article was "the alleged demand by Chief Brady for deputies to turn over certain audiotapes and the propriety of such alleged action." 312 S.W.3d at 901. We stated, "To the extent that the Article addresses Wade's incidents with the law, the emphasis is on Wade's father's reaction to those incidents, and not on Wade." *Id.* Thus, "the gist of the Article is that Chief Brady, in an effort to help his son, Wade, abused his official position by intervening on his son's behalf in an effort to 'suppress' evidence, specifically, by intimidating and coercing the deputies who issued Wade a ticket and illegally demanding and requiring them to turn over to him audiotapes related to the incident." *Id.* We concluded in *Klentzman I* that the gist of the Article was not Wade's misdeeds, as Wade was only "a secondary character." *Id.*

Chief Deputy Craig Brady's conduct and activities undertaken in his official capacity raise a matter of public concern. *See, e.g.*, *Kinney v. Weaver*, 367 F.3d 337, 361 (5th Cir. 2004) (en banc) (holding that bringing official impropriety to light is matter of public concern, "especially when it concerns the operation of a police department"); *Connick*, 461 U.S. at 148, 103 S. Ct. at 1691 (holding that speech seeking to "bring to light actual or potential wrongdoing or breach of public trust" by government official constitutes speech on matter of public concern);

*Brawner*, 855 F.2d at 191–92 (holding that alleged misconduct by public officials, particularly by law enforcement officials, is matter of public concern).

Wade argues, however, that to the extent the Article related personal details about him, a private citizen, it does not touch on matters of public concern.

In *Star-Telegram, Inc.*, a newspaper article about a sexual assault disclosed private details about the victim, and the victim filed suit against the newspaper alleging invasion of privacy by publically disclosing embarrassing private facts' one element of the suit required that the plaintiff establish that "the matter publicized is not of legitimate public concern." 915 S.W.2d at 473–74. The Texas Supreme Court held that "[w]hile the general subject matter of a publication may be a matter of legitimate public concern, it does not necessarily follow that all information given in the account is newsworthy." *Id.* at 474 (citing *Ross v. Midwest Commc'ns, Inc.*, 870 F.2d 271, 274 (5th Cir. 1989), and *Anonsen v. Donahue*, 857 S.W.2d 700, 704 (Tex. App.—Houston [1st Dist.] 1993, writ denied)). Thus, the supreme court concluded that a "logical nexus" should exist between the private facts disclosed about the victim and the general subject matter of the crime. *Id.* The court held that "[p]rivate details about a rape victim or the victim's identity may be irrelevant when the details are not uniquely crucial to the case, or when the publisher's 'public concern' goes to a general, sociological issue." *Id.* (citing *Ross*, 870 F.2d at 274–75 (holding that identification of

38

particular victim, details of her attack, and her knowledge were of unique credibility and persuasive force in story)).

The *Star-Telegram* court concluded that the articles in question—which disclosed details such as the victim's age, the location of her residence, the nature of her business enterprises, and the fact that she drove a 1984 black Jaguar automobile—when considered in their full context, did not disclose embarrassing private facts which were not of legitimate public concern. *Id.* In reaching this conclusion, the court stated:

> Newspapers and other media should take precautions to avoid unwarranted public disclosure and embarrassment of innocent individuals who may be involved in otherwise newsworthy events of legitimate public interest. But it would be impossible to require them to anticipate and take action to avoid every conceivable circumstance where a party might be subjected to the stress of some unpleasant or undesired notoriety without an unacceptable chilling effect on the media itself. Facts which do not directly identify an innocent individual but which make that person identifiable to persons already aware of uniquely identifying personal information, may or may not be of legitimate public interest. To require the media to sort through an inventory of facts, to deliberate, and to catalogue each of them according to their individual and cumulative impact under all circumstances, would impose an impossible task; a task which foreseeably could cause critical information of legitimate public interest to be withheld until it becomes untimely and worthless to an informed public.

*Id.* at 474–75.

Other courts have adopted a similarly broad view of what constitutes a matter of public concern. In *Lowe*, the Fifth Circuit "declined to get involved in

39

deciding the newsworthiness of specific details in a newsworthy story where the details were 'substantially related' to the story." 487 F.3d at 251. The plaintiff in *Lowe* argued that "while the details of the alleged blackmail scheme may be matters of public concern, other details within the article . . . were not matters of public concern." *Id.* The court concluded that it would not "circumscribe the paper's coverage in this case by imposing judicial rules on what is relevant and appropriate in a story that is based on very personal [details], which became newsworthy by their connection to the alleged crimes." *Id.*; *see also Cinel v. Connick*, 15 F.3d 1338, 1346 (5th Cir. 1994) ("[W]e are not prepared to make editorial decisions for the media regarding information directly related to matters of public concern."); *Ross*, 870 F.2d at 275 ("Exuberant judicial blue-penciling after-the-fact would blunt the quills of even the most honorable journalists.").

Here, just as in *Star-Telegram* and *Lowe*, the Article identified Wade as the son of a prominent local law-enforcement official who, as we held in *Klentzman I*, allegedly "abused his official position by intervening on his son's behalf in an effort to 'suppress' evidence." 312 S.W.3d at 901. It also related personal details about Wade, a private citizen. It provided his name, general age, and details of his behavior. Placed in this context, there is a logical nexus between statements disclosing details about Wade and the official misconduct described in the Article. Identifying Wade by name as Craig Brady's son and describing his various

interactions with law enforcement put Craig's official conduct into context and explained the purpose behind his alleged misdeeds. *See Star-Telegram, Inc.*, 915 S.W.2d at 474–75; *Lowe*, 487 F.3d at 251. As we stated in *Klentzman I*, Wade "is a secondary character" in the Article, "portrayed as the beneficiary of his father's purportedly improper actions, whose dealings with the law provided the catalyst for his father's alleged misconduct." 312 S.W.3d at 901.

A private citizen's encounters with law enforcement and the related legal proceedings also constitute matters of public concern. *See Cox Broad. Corp.*, 420 U.S. at 492, 95 S. Ct. at 1045 ("The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions . . . are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government."). Thus, the details of Wade's various interactions with law enforcement—as the victim of a cell phone theft, as the subject of a MIP citation and trial, or as a citizen who was briefly handcuffed and questioned by an officer—are also matters of public concern. *See Lowe*, 487 F.3d at 250 ("[T]here is a legitimate public interest in facts tending to support an allegation of criminal activity, even if the prosecutor does not intend to pursue a conviction."); *Cinel*, 15 F.3d at 1346 (holding that materials related to plaintiff's guilt or innocence of criminal conduct constituted matter of legitimate public concern).

Wade emphasizes the biased and untruthful manner of Klentzman's reporting on this topic, including the fact that the Article implied his guilt on the MIP charge when, in fact, he was actually acquitted by a jury—a fact that Klentzman failed to report—and the Article's mischaracterization of his other encounters with law enforcement. However, whether a statement is defamatory and whether it is false are separate issues that must be examined independently from our analysis of whether the Article addressed a matter of public concern. *See McLemore*, 978 S.W.2d at 571 (providing elements of defamation cause of action as including (1) publication of statement (2) that was defamatory concerning plaintiff (3) while acting with either negligence or malice); *see also Hepps*, 475 U.S. at 776–77, 106 S. Ct. at 1564 (holding that common-law presumption that defamatory speech is false cannot stand when plaintiff sues media defendant for speech of public concern, and thus plaintiff bears burden of proving falsity).

While a statement or the gist of statements made about the plaintiff may be defamatory, the "arguably 'inappropriate or controversial character of a statement is irrelevant to the question [of] whether [the statement] deals with a matter of public concern.'" *See Snyder*, 131 S. Ct. at 1216 (quoting *Rankin*, 483 U.S. at 387, 107 S. Ct. at 2898). Rather, under the standards set out by both Texas state and federal courts, to avoid creating "an unacceptable chilling effect on the media itself," courts ought not to define matters of public concern in so narrow a way as

to require media outlets "to anticipate and take action to avoid every conceivable circumstance where a party might be subjected to the stress of some unpleasant or undesired notoriety" or that would require them "to sort through an inventory of facts, to deliberate, and to catalogue each of them according to their individual and cumulative impact [on private citizens] under all circumstances." *See Star-Telegram, Inc.*, 915 S.W.2d at 474–75.

We therefore decline to consider Wade's allegations that Klentzman's reporting was biased and untruthful as going to whether the facts as stated in the Article were newsworthy or matters of public concern. Rather, because we have concluded that there is a logical nexus between the details about Wade that were included in the Article and the public interest in official conduct and the criminal justice system, we decline "to get involved in deciding the newsworthiness of specific details in a newsworthy story where the details were 'substantially related' to the story." *See Lowe*, 487 F.3d at 251 (declining to "circumscribe the paper's coverage in this case by imposing judicial rules on what is relevant and appropriate in a story that is based on very personal [details], which became newsworthy by their connection to the alleged crimes"); *Ross*, 870 F.2d at 275 (stating that "judges, acting with the benefit of hindsight, must resist the temptation to edit journalists aggressively" because "[e]xuberant judicial blue-penciling after-the-fact would blunt the quills of even the most honorable journalists"); *see also Cinel*, 15

F.3d at 1346 ("[W]e are not prepared to make editorial decisions for the media regarding information directly related to matters of public concern.").

We conclude that the Article addresses a matter of public concern, and the trial court erred in ruling to the contrary. We must now consider the effect this error had on the burden of proof of defamation.

**B.     Proof of Defamation Claim Made by Private Individual against Media Defendant in Matter of Public Concern**

As we stated in *Klentzman I*, to prevail on his cause of action for libel against a media defendant, Wade had to prove that Klentzman and The Star (1) published a statement (2) that was defamatory concerning him (3) while acting with negligence regarding the truth of the statement. 312 S.W.3d at 897, 907 (providing elements of libel against media defendant); *see also McLemore*, 978 S.W.2d at 571. "The third requirement [of a defamation claim] relates to a showing of fault on the part of the media defendant, which is a constitutional prerequisite for defamation liability." *Klentzman I*, 312 S.W.3d at 897.

A private plaintiff like Wade need only prove negligence on the part of the media defendant—that is, the private plaintiff must show that the defendant knew or should have known that the defamatory statement was false—in order to recover actual damages even in a matter of public concern. *See id*. at 898 (citing *McLemore*, 978 S.W.2d at 571). However, we recognized in *Klentzman I* that when a private individual brings a defamation suit that involves a matter of public

44

concern against a media defendant, damages cannot be presumed, as they are in a defamation suit under the common law; nor must the defendant prove the substantial truth of the statement to avoid liability. *See id.* Rather, "the constitutional requirements of the First Amendment supersede the common law presumption of falsity, and the plaintiff—whether a public plaintiff or a private individual—is required to prove the falsity of the challenged statement by a preponderance of the evidence before recovering any damages. *Id.*; *see Hepps*, 475 U.S. at 776–77, 106 S. Ct. at 1563-64 (stating, "[O]n matters of public concern, . . . a private-figure plaintiff must bear the burden of showing that the speech at issue is false before recovering damages for defamation from a media defendant," and holding that common-law presumption that defamatory speech is false must fall to "a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages").

In addition, when a private plaintiff's defamation action against a media defendant arises out of a matter of public concern, the plaintiff must establish actual malice to recover either presumed or punitive damages. *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637 (Tex. 2005); *Klentzman I*, 312 S.W.3d at 898; *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334, 349, 94 S. Ct. 2997, 3004, 3011 (1974) (stating that "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity

45

or reckless disregard for the truth" and defining statement made with actual malice as one made "with knowledge that it was false or with reckless disregard of whether it was false or not").

The Supreme Court has held that defamation plaintiffs who do not prove a media defendant's knowledge of the falsity of his statement or reckless disregard for the truth are restricted to recovering only compensation for their actual injuries. *Gertz*, 418 U.S. at 349–50, 94 S. Ct. at 3012. Notably, the court specifically declined to define or limit the scope of "actual injury," stating,

> We need not define "actual injury," as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.

*Id.*

In the instant case, Wade is a private individual who sued media defendants Klentzman and The Star for defamation in statements made about him in the Article that had a logical nexus with a matter of public concern. Therefore, to recover actual damages from Klentzman and The Star, he was required to prove both the falsity of the statements made by the defendants and his own actual injury, such as "impairment of reputation . . . , personal humiliation, and mental anguish

46

and suffering." *See id.* To recover either presumed damages—damages presumed to follow on a defamatory statement without proof of actual injury—or punitive damages, he had to prove actual malice on the part of Klentzman and the Star. *See id.* at 349, 94 S. Ct. at 3011. That is, he had to prove that Klentzman and The Star made a false statement about him with knowledge that it was false or with reckless disregard of whether it was false or not. *See id.*

We sustain Klentzman and The Star's first issue insofar as they argue that Wade's case against them involves a matter of public concern that places a heightened burden of proof on Wade. We turn, therefore, to whether the jury charge accurately reflected the burden of proof.

### Jury Charge Error

Klentzman and the Star also argue in their first issue that the trial court refused, over their objection, to submit the correct jury charge for a defamation case brought by a private individual against a media defendant regarding statements that addressed a matter of public concern and that this error resulted in the submission of an erroneous charge that probably caused the rendition of an improper judgment, requiring reversal. *See* TEX. R. APP. P. 44.1(a) (providing that no judgment may be reversed on appeal based on error of law unless we conclude that error probably caused rendition of improper judgment). Specifically, Klentzman and The Star argue that, in Question 5, the jury charge incorrectly

47

placed the burden for proving the substantial truth of the statements made about Wade on them, rather than placing the burden of proving the falsity of the statements on Wade. They further argue that the jury charge erroneously instructed the jury in Question 9 that it could award presumed damages, and it improperly allowed the jury, in response to Question 10, to award punitive damages without requiring Wade to prove actual malice under the proper definition. Klentzman and The Star filed written objections on these grounds in the trial court and submitted alternative questions addressing their claims.

## A.    Standard of Review

We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or principles. *Moss v. Waste Mgmt. of Tex., Inc.*, 305 S.W.3d 76, 81 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A trial court has wide discretion in submitting instructions and jury questions. *Id.* This discretion is subject only to the requirement that the questions submitted must (1) control the disposition of the case; (2) be raised by the pleadings and the evidence; and (3) properly submit the disputed issues for the jury's determination. TEX. R. CIV. P. 277, 278; *Moore v. Kitsmiller*, 201 S.W.3d 147, 153 (Tex. App.—Tyler 2006, pet. denied); *see also*

48

*Shupe*, 192 S.W.3d at 579 ("When a trial court refuses to submit a requested instruction on an issue raised by the pleadings and evidence, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict.").

When a proper objection is made about the omission of an essential element, the failure to include it in the charge is reversible error. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 44 (Tex. 2007). "It is fundamental to our system of justice that parties have the right to be judged by a jury properly instructed in the law." *Id.* (quoting *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000)). While the plaintiff bears the burden to obtain affirmative answers to jury questions as to necessary elements of his cause of action, we observe that "submission of the charge is the trial court's responsibility, and the consequences of the trial court's error should not fall unduly upon plaintiffs." *See id.*; *Spencer v. Eagle Star Ins. Co.*, 876 S.W.2d 154, 158 (Tex. 1994).

To determine whether an alleged error in the jury charge is reversible, we must consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety to determine if the trial court abused its discretion. *Rosell*, 89 S.W.3d at 653 (citing *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986) (op. on reh'g)). We reverse if the trial court denied a proper submission of a valid theory of recovery raised by the

pleadings and the evidence. *Id.* (citing *Perez*, 842 S.W.2d at 631). Otherwise, we do not reverse unless harm results, i.e., unless the error probably caused the rendition of an improper judgment. *Id.* (citing TEX. R. APP. P. 44.1(a)(1)); *see also Shupe*, 192 S.W.3d at 579 ("Error in the omission of an issue is harmless 'when the findings of the jury in answer to other issues are sufficient to support the judgment.'").

## B.    Defects in the Charge

Because the Article addressed a matter of public concern, Wade could not obtain presumed damages, and he bore the burden of proving that the statements were false and negligently made to obtain actual damages. *See Hepps*, 475 U.S. at 776–77, 106 S. Ct. at 1564 (holding that common-law presumption that defamatory speech is false cannot stand when plaintiff sues media defendant for speech of public concern). He also had to prove actual malice under the appropriate standard in order to obtain punitive damages. *See id.; Gertz*, 418 U.S. at 349, 94 S. Ct. at 3011 ("[T]he States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth.").

However, the jury charge improperly asked the jury in Question 5 whether the defamatory statements referenced in Question 4 were "substantially true at the time they were made as they related to Wade Brady"—defining "substantially

true" as meaning a statement "that varies from the literal truth in only minor details or if, in the mind of the average person, the gist of it is no more damaging to the person affected by it than a literally true statement would have been"—rather than placing the burden on Wade to establish whether either the allegedly defamatory statements or the gist of the Article were false.

The charge also incorrectly instructed the jury with respect to Question 9 that if it found that the Article was defamatory "per se," then it was required to presume "at least nominal damages for injury to reputation in the past," although the jury could not award presumed damages. It did not require that the jury find actual damages, and it did not define "nominal damages."

Finally, the jury charge improperly instructed the jury with respect to Question 10 that it could award punitive damages based on a finding of common-law malice, rather than requiring that Wade prove actual malice under the appropriate defamation standard. Specifically, Question 10 defined malice as either "specific intent by Klentzman to cause substantial injury to" Wade or an act or omission by Klentzman that involved an extreme degree of risk or involved risk of which Klentzman had "actual, subjective awareness . . . , but nevertheless proceed[ed] with conscious indifference to the rights, safety, or welfare of others." And it relied on this same instruction in asking whether exemplary damages should be awarded to Wade against The Star in Questions 12, 13, and 14. It did not define

51

a statement made with actual malice as a false statement made about Wade with knowledge that it was false or with reckless disregard of whether it was false or not, as required for an individual to obtain exemplary damages against a media defendant for defamatory statements made against him that have a logical nexus to a matter of public concern. *See Gertz*, 418 U.S. at 334, 349, 94 S. Ct. at 3004, 3011 (requiring proof of actual malice to obtain exemplary damages in such circumstances and defining statement made with actual malice as one made "with knowledge that it was false or with reckless disregard of whether it was false or not").

We conclude that there were errors in the jury charge. We sustain this part of Klentzman and The Star's first issue and turn to whether these errors probably caused the rendition of an improper judgment so that rendition or remand for a new trial is the proper remedy.

## C.    Effect of Jury Charge Error

In their first issue, Klentzman and The Star seek reversal of the trial court's judgment due to the errors in the jury charge. However, they provide no argument regarding whether remand for a new trial or rendition of judgment is the appropriate remedy.

### 1.      *Reversal for Defective Jury Charge*

A case will be reversed for jury charge error only if the error probably caused rendition of an improper judgment.  TEX. R. APP. P. 44.1(a).

Here, the jury was improperly charged on proof of falsity, actual damages, and actual malice, and, consequently, on the requirement for finding exemplary damages.  We conclude, therefore, that the judgment was improper.

When a proper objection is made about the omission of an essential element, the failure to include that element in the charge is reversible error.  *Ledesma*, 242 S.W.3d at 44.  If the theory of recovery was defectively submitted, as opposed to a situation in which the plaintiff "refused to submit a theory of liability" after defendant's objection, the proper remedy is to remand for a new trial if there is legally sufficient evidence to support the plaintiff's claim.  *See id.*; *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997) (holding that remand is appropriate if charge improperly instructed the jury and legally sufficient evidence exists to support claim); *see also Spencer*, 876 S.W.2d at 157 (holding that trial court may disregard jury finding only if it is unsupported by evidence or if issue is immaterial).

Here, Wade submitted several theories of liability and questions regarding substantial truth, fault, and malice to the jury, but the charge used improper definitions and questions.  Thus, this is a case where the plaintiff submitted jury

questions on his claim that were "defective" rather than immaterial or completely omitted. *See Ledesma*, 242 S.W.3d at 44.

## 2. Legal Sufficiency of the Evidence

Klentzman and The Star argue that the evidence was legally insufficient for Wade to meet his burden of proving falsity or to establish his actual and punitive damages.[4]

In a legal sufficiency, or "no-evidence" review, we determine whether the evidence would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller*, 168 S.W.3d at 827. In conducting this review, we credit favorable evidence if a reasonable fact-finder could, and we disregard contrary evidence unless a reasonable fact-finder could not. *Id.* We consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *Id.* at 822. We must sustain a no-evidence contention only if (1) the record reveals a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to

---

[4] In their seventh issue, Klentzman and The Star argue that the evidence was legally and factually insufficient to support a finding that the gist of the Article or the complained-of statements was false. In their eighth and ninth issues, Klentzman and The Star argue that the evidence was legally and factually insufficient to support the jury's findings that Wade was entitled to actual damages for past mental anguish and past injury to his reputation. As we conclude above, the record contains legally sufficient evidence on these claims. Because we are remanding for a new trial, we do not address the remainder of these issues.

prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810; *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997); *see also Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998) ("Anything more than a scintilla of evidence is legally sufficient to support the finding.").

Wade submitted evidence to support each of the elements of his claim. Therefore, we conclude that the evidence was legally sufficient to support Wade's claims and that the case should therefore be remanded for a new trial.

### a. *Proof of falsity*

There is legally sufficient evidence to support defamation.

Regarding Wade's burden to establish falsity, courts use the "substantial truth" test to determine the falsity of a factual statement. *Neely*, 418 S.W.3d at 63–64; *Vice*, 318 S.W.3d at 17 & n.9. A statement is substantially true, and thus not actionable, if, in the mind of the average person who reads the statement, the allegedly defamatory statement is not more damaging to the plaintiff's reputation than a truthful statement would have been. *Neely*, 418 S.W.3d at 63; *Klentzman I*, 312 S.W.3d at 899.

Here, the Article failed to state at any point that Wade had been acquitted by a jury on the MIP charge. The failure to report that Wade was acquitted, leaving the impression that he was guilty of the MIP charge, was clearly more damaging to

his reputation in the mind of the average reader than the truth would have been. *See Neely*, 418 S.W.3d at 63. Furthermore, the facts in the Article were juxtaposed in a way that made it seem that Craig Brady interfered with the presentation of evidence at Wade's MIP trial and that Craig Brady took improper actions in an attempt to enforce an invalid expunction order. However, the testimony of both Craig Brady and the officers involved indicated that Craig Brady did not attempt to influence the MIP proceedings against Wade and that Craig Brady's involvement in implementing the expunction order following Wade's acquittal was limited. The Article stated that officials were questioning the validity of the expunction order and that the TMPA was investigating the incident. However, McDougal, with the TMPA, testified that he did not opine on the validity of the expunction order and that he did not believe TMPA was involved with seeking to void the order. Childers, the county attorney, also testified that he did not form or express any opinion on the validity of Wade's expunction order and that his statement quoted in the Article was based on a very narrow hypothetical posed by Klentzman and not on the facts of Wade's case.

The Article also related the circumstances surrounding the theft of Wade's cell phone in May 2000 and the incident occurring in Wade's driveway approximately one week after the MIP citation in February 2001. Both of these incidents were unrelated to the MIP ticket and had occurred years before the

56

Article was published in January 2003, but their inclusion strengthened the portrayal of Wade Brady as someone who had repeated trouble with the law and depended on his father to help him.

These misrepresentations and the juxtaposition of other, non-related incidents between Wade and local law enforcement were also more damaging to Wade's reputation in the mind of the average reader than the truth would have been. *See Neely*, 418 S.W.3d at 63. Thus, we conclude that although the jury was improperly charged on proof of defamation, there is legally sufficient evidence supporting Wade's claim that the gist of the Article and the complained-of statements were false. *See City of Keller*, 168 S.W.3d at 810 (providing elements for legal sufficiency review).

### b. Proof of actual damages

Likewise, there is legally sufficient evidence of Wade's actual damages. In *Bentley v. Bunton*, the supreme court considered whether evidence supported any award of actual damages and, alternatively, whether the amount of damages awarded was supported by the record. 94 S.W.3d at 605–06. Regarding the amount of damages awarded, we are "authorized to determine whether damage awards are supported by insufficient evidence—that is, whether they are excessive or unreasonable." *Id.* at 606. Although it is impossible to calculate the exact amount of injury to reputation, which requires that the jury be given a measure of

57

discretion in finding damages, there must be some evidence to justify the amount awarded. *Id.* ("Juries cannot simply pick a number and put it in the blank. They must find an amount that, in the standard language of the jury charge, 'would fairly and reasonably compensate' for the loss.") (quoting *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996)).

Wade testified that he first became aware that the Article affected the way people in the community viewed him when he was asked to quit his job. He also testified that his friends told him that people were discussing the Article and said that it made him "look like a criminal" whose father would "get[] [him] out of trouble." Wade testified that every time he met a new person he "would wonder if it was somebody that had read this article and thought [he] was a bad person." He testified that he did not see a doctor about his condition after the Article's publication because he is "not the kind of person to talk about [his] feelings" and he found it "embarrassing"; rather, he "hid." He gained thirty pounds and was affected by the article for "about five years." His mother Jackie also testified about the effect the Article had on Wade's life, stating that he became more withdrawn and did not socialize as much as he had prior to the Article's publication. Jackie also testified that Wade gained weight and had strange dreams following the Article's publication. *See Gertz*, 418 U.S. at 350, 94 S. Ct. at 3012 (stating that defamation damages are not confined to "out-of-pocket loss," and including

58

"impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering" as examples of actual harm inflicted by defamatory falsehood); *Exxon Mobil Corp. v. Hines*, 252 S.W.3d 496, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (holding that actual damages in defamation action can include injury to character or reputation).

We conclude that the jury was improperly charged on the question of actual damages. We further conclude that legally sufficient evidence exists to support Wade's claim for actual damages.

### c.     *Proof of actual malice*

In Question 10, the jury charge defined malice for the purpose of the jury's making exemplary damage findings against Klentzman and The Star as either specific intent to cause substantial injury to Wade or an act or omission that involved an extreme degree of risk or of which Klentzman had "actual, subjective awareness" but nevertheless "proceed[ed] with conscious indifference to the rights, safety, or welfare of others." It gave no other definition with regard to Wade's request for exemplary damages against The Star. In neither case did it require Wade to show that Klentzman and The Star's statements were made with "knowledge of falsity or reckless disregard for the truth" as required to establish actual malice in order to support an award of exemplary damages. *See Gertz*, 418 U.S. at 349, 94 S. Ct. at 3011. We conclude that the jury was improperly charged

59

on the question of actual malice and therefore on the requirement for finding exemplary damages.

Despite the improper instruction, however, the record demonstrates that the statements made by Klentzman and The Star contained a number of misleading omissions and juxtapositions of fact that cast Wade in a false light. Fair-minded people, reviewing this evidence, could reasonably conclude either that Klentzman and The Star were aware that their omission of exculpatory facts and partial reporting and juxtaposition of facts in the Article conveyed a false impression of Wade that impaired his reputation or that they omitted facts and juxtaposed facts with reckless disregard for whether the impression of Wade conveyed by the gist of the Article was true or not. We conclude, therefore, that legally sufficient evidence exists to support Wade's claim for exemplary damages under the proper standard of proof. *See City of Keller*, 168 S.W.3d at 827 (in legal sufficiency, or "no-evidence" review, we determine whether evidence would enable reasonable and fair-minded people to reach verdict under review).

We conclude that the evidence is legally sufficient to support each of Wade's claims under proper jury instructions. Thus, the proper remedy is to remand for a new trial. *See Ledesma*, 242 S.W.3d at 44; *Arthur Andersen*, 945 S.W.2d at 817 (holding that remand is appropriate if charge improperly instructed jury and legally sufficient evidence exists to support claim); *see also* TEX. R. APP.

P. 44.1(b) ("The court may not order a separate trial solely on unliquidated damages if liability is contested.").

We sustain Klentzman and The Star's first issue. Accordingly, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.[5]

## Conclusion

We reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Bland.

---

[5] In their fourth and fifth issues, Klentzman and The Star argue that the trial court's instructions regarding libel per se were improper. Recently, the Texas Supreme Court addressed the issue of defamation per se and damages. It summarized the current law, holding that, although Texas law has allowed juries to presume the existence of general damages without proof of actual injury in defamation per se cases, "the Constitution only allows juries to presume the existence of general damages in defamation per se cases where: (1) the speech is not public, or (2) the plaintiff proves actual malice." *Hancock v. Variyam*, 400 S.W.3d 59, 65–66 (Tex. 2013). Because we have already held that the Article addresses a matter of public concern and that Wade must establish actual malice to recover presumed or punitive damages, we need not address these issues as they would not afford Klentzman and The Star any greater relief.